IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. **3:09-CV-1075-L** |
| | § | |
| **SALLY HAND-BOSTICK** | § | |
| **and ELIZABETH SPINELLI**, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

The court makes the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure following a bench trial on Plaintiff United States of America's ("Plaintiff," "Government" or "United States") claims that remained after summary judgment.[1]

**I.   Procedural Background**

Plaintiff originally brought this action against numerous individual defendants in the United States District Court for the Middle District of Florida on April 2, 2009, requesting permanent injunctive relief under the Internal Revenue Code ("IRC"). The Government's claims against Defendants Edward Adams, Timothy Adams, Sally Hand-Bostick ("Hand-Bostick"), and Elizabeth Spinelli ("Spinelli") (collectively, "Defendants") were severed and transferred to this court on June 2, 2009. On April 27, 2010, Edward Adams and Timothy Adams each stipulated to a permanent

---

[1] This memorandum opinion and order addresses the Government's remaining claims for injunctive relief under 26 §§ U.S.C. 7402(a), 7407, and 7408 of the Internal Revenue Code for alleged violations of 26 U.S.C. §§ 6700(a)(2)(A), 6700(a)(2)(B), 6694(a), and 6694(b)(2)(B).

injunction with the Government. The Government filed its Amended Complaint against Hand-Bostick and Spinelli on August 16, 2010. In its Amended Complaint, the Government seeks an injunction against Defendants pursuant to sections 7402(a), 7407, and 7408 of the IRC to prevent the recurrence of alleged violations of the IRC and conduct that interferes with the enforcement and administration of the internal revenue laws. More specifically, the Government requests that Hand-Bostick, Spinelli, and anyone in active concert or participation with them be permanently enjoined from:

    a.    organizing, promoting, or selling any tax shelter, plan, or other arrangement, that advises or assists customers to attempt to violate the internal revenue laws or unlawfully evade the assessment or collection of their federal tax liabilities;

    b.    making or furnishing false statements, in connection with such organization, promoting, or selling, about the allowability of any deduction or credit, the excludability of any income, or the securing of any tax benefit by the reason of participating in any such tax shelter, plan or other arrangement;

    c.    making or furnishing gross valuation overstatements (within the meaning of IRC § 6700) in connection with such organization, promoting, or selling;

    d.    preparing or assisting in the preparation of federal tax returns relating to any abusive tax shelter, plan or arrangement;

    e.    engaging in any other activity subject to penalty under I.R.C. §§ 6694, 6695, 6700, 6701, or any other penalty provision in the Internal Revenue Code;

    f.    engaging in conduct designed or intended to, or having the effect of, obstructing or delaying any Internal Revenue Service investigation or audit; and

    g.    engaging in any other conduct that interferes with the proper administration and enforcement of the internal revenue laws.

Pl.'s Am. Compl. 1-2. The Government also requests that Hand-Bostick be permanently enjoined "from preparing or filing federal tax returns for anyone other than [herself] and from advising or assisting anyone with respect to any federal tax matter." *Id.* at 2.

**Memorandum Opinion and Order - Page 2**

On March 7, 2011, Hand-Bostick and Spinelli moved for summary judgment on all of the Government's claims for injunctive relief, contending that there was no evidence to establish that they knew or should have known about the fraudulent tax scheme. They also maintained that the permanent injunctive relief requested by the Government was unwarranted because there was no indication that a permanent injunction is necessary to prevent recurrence of the complained of conduct. The Government, in response, maintained that genuine disputes of material fact existed with respect to these matters and that its claims for permanent injunctive relief under sections 7402(a), 7407, and 7408 of the IRC for IRC violations should be allowed to proceed to trial. On September 12, 2011, the court granted in part and denied in part Defendants' summary judgment motion. The motion was granted with respect to the following:

- Any theory of recovery advanced by the [G]overnment that alleges that the []Defendants possessed "actual knowledge" of the fraudulent nature of the tax scheme is dismissed with prejudice;

- The [G]overnment's claim for injunctive relief under section 7408 alleging that the []Defendants engaged in conduct subject to penalty under section 6701 is dismissed with prejudice;

- The [G]overnment's claim for injunctive relief under section 7407 alleging that the Moving Defendants acted "willfully" under section 6694(b) is dismissed with prejudice; and

- The [G]overnment's claim for injunctive relief under section 7407 alleging that the Moving Defendants engaged in fraudulent or deceptive conduct [that] substantially interferes with the proper administration of the Internal Revenue law is dismissed with prejudice.

In all other respects, the court denied Defendants' summary judgment motion, and the Government's remaining claims were set for trial. A five-day bench trial of these claims was conducted from May 8, 2012, to May 14, 2012. Hand-Bostick, Spinelli, and Internal Revenue Service ("IRS") Agent Jean Lane ("Lane") testified during the trial. The court also heard testimony from the following taxpayers

for whom Hand-Bostick prepared tax returns, which included tax credits available under section 45K of the IRC for the production and sale of fuel from nonconventional sources, commonly known as "FNS Credits": Janelle Cook Mason, Vernon Tucker, Laura Edwards, Robert Pasqual, Kimberly Patton, Vinson Stanphill, and Larry Jones. A number of exhibits, to which there were no objections, were preadmitted at the beginning of the trial pursuant to the parties' Joint List of Exhibits (Doc. 180). All other evidence admitted during the course of the trial was subject to any objections by the parties. The parties filed their proposed findings of fact and conclusions of law on October 4, 2012. On March 20, 2013, the court heard closing arguments by the parties.

Based upon a preponderance of the evidence, the court makes the following findings of fact and conclusions of law as required by Rule 52(a).[2] The facts contained herein are either undisputed, or the court has made the finding based on the credibility or believability of each witness. In doing so, the court considered all of the circumstances under which the witness testified, including: the relationship of the witness to Plaintiff or Defendants; the interest, if any, the witness has in the outcome of the case; the witness's appearance, demeanor, and manner of testifying while on the witness stand; the witness's apparent candor and fairness, or the lack thereof; the reasonableness or unreasonableness of the witness's testimony; the opportunity of the witness to observe or acquire knowledge concerning the facts to which he or she testified; the extent to which the witness was contradicted or supported by other credible evidence; and whether such contradiction related to an

---

[2] In preparing this memorandum opinion and order, the court carefully considered the trial testimony and exhibits and applied the standard in this circuit for findings of fact and conclusions of law. *See Century Marine Inc. v. United States*, 153 F.3d 225, 231 (5th Cir. 1998) (discussing standard for findings and conclusions under Rule 52). In accordance with that standard, the court has not set out its findings and conclusions in "punctilious detail" or "slavishly traced the claims issue by issue and witness by witness, or indulged in exegetics, parsing or declaiming every fact and each nuance and hypothesis." *See id.* The court instead has limited its discussion to those legal and factual issues that form the basis of its decision. *Id.*

important factor in the case or some minor or unimportant detail. When necessary, the court comments on the credibility of a witness or the weight to be given to a witness's testimony. To the extent any conclusion of law is deemed to be a finding of fact, it is adopted as such; and likewise, any finding of fact that is deemed to be a conclusion of law is so adopted.

## II.    Findings of Fact

This case arises out of an expansive fraudulent tax scheme masterminded by Greg Guido ("Guido") and George Calvert ("Calvert"). The scheme involved tax credits available under section 45K of the IRC for the production and sale of fuel from nonconventional sources, commonly known as "FNS Credits." Producers of qualified fuels under section 45K will often end up with more FNS Credits than they need in a given year to eliminate their tax liability, and unused credits cannot be carried forward into subsequent tax years. Therefore, in certain situations, producers are allowed to monetize their excess FNS Credits and sell or assign them to third parties, allowing the producers to derive some benefit from their unused credits.

With respect to the FNS Credits at issue in this case, Guido and Calvert claimed to own and operate several methane gas production facilities on landfills located in various parts of the country through an entity they created called Gas Recovery Partners 2, GP ("GRP2"). Beginning in 2003, Louis Powell ("Powell"), a Texas promoter involved in the scheme, started representing to taxpayers and tax preparers, including Hand-Bostick, that he had obtained the rights to millions of dollars of FNS Credits derived from GRP2 facilities through an entity that he created called U.S. Energy Credits ("USEC"). Hand-Bostick is a tax return preparer, who began preparing tax returns in 1991 and, as of the date of the trial in this case, continues to prepare federal tax returns for clients. Hand-Bostick testified that she anticipates preparing federal tax returns for clients for the foreseeable

future. Hand-Bostick sold her tax preparation services through her company National Express Tax. Hand-Bostick also sold Drake Software to professional tax return preparers from 1990 to approximately 2009. During that time, Hand-Bostick attended annual tax preparation update training sessions offered by Drake. Hand-Bostick also attended training sessions and classes offered by the National Association of Tax Preparers. Hand-Bostick completed high school but did not go to college. She has had no legal training.

Hand-Bostick first learned about FNS Credits in the summer of 2003 while attending a meeting for the Texas Society of Enrolled Agents. Hand-Bostick sat at a vendor's table for Drake Software at the meeting. Powell gave a presentation at the meeting about FNS Credits. Through her position at Drake Software, Hand-Bostick knew that Powell was an Enrolled Agent and tax preparer, and she believed that he was either the incoming or outgoing president of the Enrolled Agents Society when he gave the presentation.

After finishing his presentation, Powell approached Hand-Bostick and spoke to her personally about the FNS Credits. Powell explained that he had developed a program that taxpayers could use to claim FNS Credits as needed to reduce or eliminate their federal tax liability. Powell represented to Hand-Bostick that her customers could purchase an interest in one of his several partnerships that qualified for FNS Credits due to the ownership interests in fuel production facilities operated by GRP2, and that her customers could take FNS Credits on their federal income tax returns based on their percentage of ownership in the fuel sold by those facilities.

Powell also provided Hand-Bostick with a pamphlet prepared by USEC, which she reviewed. The pamphlet marketed FNS Credits as a means to "HELP YOUR CLIENTS LESSEN THEIR TAX BURDEN WHILE INCREASING YOUR PERSONAL INCOME" and indicated that some

taxpayers "may be able to COMPLETELY ZERO OUT THEIR TAX!" Defs.' Ex. 36. In addition, the pamphlet indicated that the taxpayer's "tax liability . . . determines the benefit" and that:

> As a tax professional, you know that personal tax research or trust in someone else's research is the only tested method of significance. We at U.S. Energy Credits have done the research. Our team includes EAs, CPAs, former IRS revenue agents, attorneys, CFPs, and oil and gas industry experts. Personally, we have owned and operated a private tax office in Texas since 1974. Our office has been using FNS credits for ten years on individual tax returns. Specifically, since 1994, six IRS private letter rulings have been handed down which have continued to allow the assignment of Section 29 credits to third parties.

*Id.*

Although Hand-Bostick was not familiar with USEC, she testified that this paragraph in the USEC pamphlet was significant to her in evaluating the FNS Credit program promoted by Powell because she thought his willingness to put in writing what he had explained verbally to her indicated that he had done the necessary due diligence regarding the FNS Credits that he was promoting. Powell also told Hand-Bostick that she could earn a 5% commission on all FNS Credits that she claimed on her customers' tax returns. Hand-Bostick did not fully understand the FNS Credits and did not ask Powell to provide any support for his representations regarding the FNS Credits or his ownership in the fuel production facilities. She relied on Powell's representations that he had the claimed interests in the fuel production facilities, that all necessary due diligence had been conducted, and that monetization of the FNS Credits was proper.

After claiming FNS Credits on her own 2002 tax return, Hand-Bostick decided to offer the FNS Credits to her customers and invited Powell to her office in late 2003 to go over the details of the FNS Credit program again to make certain she understood it and would know how to present it to her customers. Powell accepted Hand-Bostick's invitation and gave a presentation regarding the FNS Credits and provided additional materials about the credits. Hand-Bostick invited two other

**Memorandum Opinion and Order - Page 7**

tax preparers to attend the presentation so that they could also learn about FNS Credits—Mark Johnson, a tax preparer in Hand-Bostick's office, and Vinson Stanphill, a tax return preparer who Hand-Bostick knew through Drake Software.

Powell provided Hand-Bostick with a booklet titled "US Energy Credits Guidebook," which contained instructions on how to claim FNS Credits for customers. The booklet instructed that, for customers interested in taking FNS Credits, an assignment request must be sent to USEC, together with: (1) a down payment of $100 to use the credits in the taxable year for which the customer wanted to use the FNS Credits; and (2) a promissory note to pay for the credits by the following April 15. Hand-Bostick's customers did not make the $100 down payment to USEC or sign and send a promissory note in the taxable year that the credits were claimed. Hand-Bostick instead followed Powell's instructions to send him a list of likely FNS credit customers with an estimate of the number of credits each customer would require for 2003 tax year. According to Hand-Bostick, Powell then assigned the number of estimated credits to each of her customers on the list. Hand-Bostick testified that she thought that the assignment process used by Powell entitled her customers to take FNS Credits on their 2003 tax year when she prepared the returns in 2004.

Hand-Bostick first advised her customers by letter about the FNS Credits opportunity in 2003 but did not actually speak to any of her customers on the list about the program until 2004. After determining her customers' tax liability for 2003, Hand-Bostick explained to her customers how they could reduce their tax liability by using FNS Credits. Hand-Bostick calculated the number of FNS Credits for which each customer qualified by using a Tax Calculator and showed her customers that they could reduce their tax liability by approximately 20% by claiming the FNS Credits on their returns. When her customers agreed to claim the FNS Credits in 2004 on their 2003 tax returns,

Hand-Bostick printed the transaction documents from the Tax Calculator, including the partnership agreement, assignment agreement, and promissory note, which were all backdated to January 2, 2003, and provided them to her customers when they came to her office to have their tax returns prepared. When the paperwork was complete, Hand-Bostick had her customers write a check to USEC for the price of the number of FNS Credits the customer used. Hand-Bostick then revised the customers' 2003 tax returns to add the FNS Credits and other numbers from the Tax Calculator before submitting the returns to the IRS. Hand-Bostick did not understand how the Tax Calculator generated the numbers that she included in her customers' tax returns and was unable to explain how the numbers were calculated. Hand-Bostick always waited to forward her customers' documentation and checks for the FNS Credits to USEC until after they received their refund.

In mid-2004, Powell introduced Hand-Bostick to Guido and Calvert and told her that they were taking over the FNS Credit program. Powell also informed her that her customers' partnership interests would now be "working interests" in a GRP2 production facility. After Powell's departure, Hand-Bostick worked directly with GRP2 for the 2004 tax year. Before this point in time, Hand-Bostick did not know Guido or Calvert and had never heard of GRP2. In exchange for recruiting other tax preparers to offer FNS Credits to their customers, Guido offered Hand-Bostick a 5% commission for all FNS Credits that were processed through her office, and an additional 10% commission on all FNS Credits that she personally sold. Hand-Bostick accepted the offer and recruited other tax return preparers to sell the FNS Credits. She also established a company in 2004, CynDan, to process the FNS Credit paperwork and commissions for twelve tax return preparers and herself for the 2004 and 2005 tax years.

Before Guido took over, Powell told Hand-Bostick that there were no more FNS Credits. Guido and Calvert, however, told Hand-Bostick that there were extra credits available for 2003 that she could sell to her customers. Hand-Bostick promoted these extra credits to some of her customers in the fall of 2004 and recommended that they amend their 2003 returns to include the newly available FNS Credits to obtain a higher refund. Hand-Bostick also recommended to other tax return preparers that they prepare amended 2003 tax returns for their customers. For her own customers, Hand-Bostick prepared the amended returns to include FNS Credits in the same manner that she had done in preparing the original 2003 tax returns by using backdated documentation and having her customers make out checks to one of Guido's companies. She then provided her customers with a breakdown of the money that they saved using the FNS Credits. In December 2006, after Calvert told Hand-Bostick that the FNS Credits were no longer available, she provided her customers with a backdated form that purported to assign their FNS interests back to Calvert and Guido on January 1, 2006. Between 2004 and 2005, Hand-Bostick sold approximately $1.5 million in disallowed FNS Credits to her customers, and earned $225,000 to $300,000 in commissions.

Spinelli is a certified public accountant ("CPA") and provided services as a tax return preparer during the time of the events that gave rise to this case. Spinelli also obtained a college degree from the University of Texas at Dallas in 1987 with an emphasis in accounting. Spinelli usually refers her customers to other CPAs when she feels that she is not qualified to prepare their tax returns. To obtain her CPA license, Spinelli took approximately 130 hours of courses and was required to pass a series of examinations. Spinelli must take forty hours of continuing education per year to maintain her CPA license. Spinelli typically took tax classes from the Texas A&M Extension Foundation and the CPE Depot, including general and advanced tax workshops. These workshops

provided information on topics including individual income tax returns, legislative changes, and tax credits. Like Hand-Bostick, Spinelli intends to continue to prepare tax returns for customers in the future.

Spinelli first learned about FNS Credits in 2004 and called Hand-Bostick to learn more about them. Hand-Bostick told Spinelli that she was offering the credits to her clients through USEC via GRP2, and she referred Spinelli to Powell for additional information. During a telephone call, Powell told Spinelli that he had visited all the landfills in the United States and seen signs indicating that GRP2 was operating part of the landfill. Spinelli ultimately relied on Powell's representations that he had personally visited all of the landfills to ensure that they were functioning properly. Aside from this one conversation with Powell, Spinelli received all of her information about the FNS Credits from Hand-Bostick. Thereafter, Spinelli began offering FNS Credits to her customers at her tax preparation business using a method similar to that used by Hand-Bostick that included the use of backdated documents. Like Hand-Bostick, Spinelli did not understand the mechanics of how the FNS Credits worked. Between 2004 and 2006, Spinelli sold approximately $500,000 of FNS Credits to her customers that were ultimately disallowed, and earned approximately $25,000 in commissions. Spinelli stopped selling FNS Credits in 2006 when Hand-Bostick told her that the FNS Credits were no longer available, and she provided her customers with the same backdated form that purportedly assigned their FNS interest back to Calvert and Guido on January 1, 2006.

The IRS started investigating the FNS Credit scheme in 2004 and began disallowing FNS Credits in 2006. Between December 2006 and March 2007, Hand-Bostick learned that the IRS was auditing customers of other tax preparers and requesting documentation to support the FNS Credits taken. Hand-Bostick wrote to Guido, requesting his assistance in responding to certain requests for

**Memorandum Opinion and Order - Page 11**

information by the IRS. Guido sent Hand-Bostick some documents purporting to contain information responsive to the IRS's requests. After learning that one of her customers was being audited in May 2007, Spinelli contacted Hand-Bostick, who told Spinelli that she should talk to Guido. Spinelli wrote Guido on May 24, 2007, seeking advice that she could give to her customer because she did not have the information needed to substantiate her customer's claim for FNS Credits in response to the audit. Guido told Spinelli to contact Walter Drakeford ("Drakeford"), an attorney for GRP2, about her customer's audit. Guido similarly advised Hand-Bostick to contact Drakeford with questions. Drakeford told Spinelli that he would provide documentation needed to respond to the IRS audit, but he never did. As a possible solution, Spinelli and Hand-Bostick also asked Drakeford to transfer or reassign their customers to other wells. This never happened.

In the fall of 2007, Hand-Bostick and Spinelli were contacted by agent John McGuire ("McGuire") with the Criminal Investigation Division of the IRS and IRS Revenue agent Lane. McGuire advised Defendants that the IRS was investigating whether GRP2 owned the property interests that were used to claim the FNS Credits. Lane advised Defendants that their customers did not own property interests necessary to take the FNS Credits. McGuire subpoenaed documents from Spinelli and interviewed her about the credits. Spinelli, who had retained attorney Larry Jones ("Jones") to assist with her customer's audit, asked Jones to speak with McGuire. By January 2008, the FNS Credits claimed by Defendants' customers were disallowed by the IRS because the promoters of the program did not own any interest that would support FNS Credits. Spinelli nevertheless continued to believe that Guido or Drakeford had the documentation necessary to support her customers' claims to FNS Credits.

Beginning in 2009, for 2008 tax returns, Hand-Bostick and Spinelli began claiming thousands of dollars in long-term capital loss deductions on their customers' 2008 federal income tax returns, relating to their customers' purported interests in gas-producing properties. Hand-Bostick and Spinelli each described the asset related to the loss as GRP2 and stated that it represented the disallowed FNS Credit interest purchased by their customers. Hand-Bostick continued asserting a long-term capital loss through 2010 for the tax year 2009, and Spinelli started asserting theft loss deductions related to the disallowed FNS Credits on her customers' tax returns in mid-2008.

### III.  Conclusions of Law

The parties agree that the Government has the burden of proof on its claims and that the evidentiary standard is a preponderance of the evidence. As previously indicated, the Government seeks a permanent injunction against Defendants under sections 7402(a), 7407 and 7408 of the IRC for alleged violations of I.R.C. §§ 6700(a)(2)(A), 6700(a)(2)(B), 6694(a), and 6694(b)(2)(B). Section 7407 of the IRC authorizes the United States to bring a civil action to enjoin any person who is a "tax return preparer" from further engaging in conduct subject to penalty under section 6694 or further acting as a tax return preparer. I.R.C. § 7407. Section 7408 of the IRC applies to actions to enjoin specified conduct related to tax shelters and authorizes the United States to bring a civil action to enjoin any person from further engaging in conduct subject to penalty under section 6700 to prevent recurrence of such conduct. I.R.C. § 7408. Section 7402 of the IRC acts as a catch-all provision and authorizes the United States to seek an injunction against a defendant "as may be necessary or appropriate for the enforcement of the internal revenue laws." I.R.C. § 7402(a).

### A. Conduct Subject to Penalty Under Sections 6700(a)(2)(A) and 6700(a)(2)(B)

It is a violation of section 6700(a)(2)(A) of the Internal Revenue Code when any person, in organizing or participating in any arrangement, makes or furnishes a statement concerning the allowability of any deduction or tax credit that she knows or has reason to know is false or fraudulent as to any material matter. I.R.C. § 6700(a)(2)(A). Section 6700's "reason to know standard" has been treated as equivalent to "should have known" and "allows imputation of knowledge so long as it is commensurate with the level of comprehension required by the speaker's role in the transaction" but does not include a duty of inquiry. *United States v. Campbell*, 897 F.2d 1317, 1322 (5th Cir. 1990).

It is a violation of section 6700(a)(2)(B) for any person, in organizing or participating in any arrangement, to make or furnish a gross valuation overstatement as to any material matter. *Id.* § 6700(a)(2)(B). Section 6700(a)(2)(B) eliminates the requirement of scienter. *See* I.R.C. § 6700(a)(2)(B); *United States v. Campbell*, 704 F. Supp. 715, 726 (N.D. Tex. 1988), *aff'd*, 897 F.2d 1317 (5th Cir. 1990) ("Scienter need not be shown to hold a person liable for gross valuation overstatements."). The IRC defines "gross valuation overstatement" as follows:

> [A]ny statement as to the value of any property or services if (A) the value so stated exceeds 200 percent of the amount determined to be the correct valuation, and (B) the value of such property or services is directly related to the amount of any deduction or credit allowable under chapter 1 to any participant.

I.R.C. § 6700(b)(1). In *United States v. Woods*, the Supreme Court held that the gross valuation-misstatement penalty applies in cases in which the transactions in question are found to lack economic substance. 134 S. Ct. 557, 562-63 (2013). The Government contends that Defendants engaged in both types of prohibited conduct in connection with the FNS Credit scheme. The

Government contends that Defendants provided gross valuation overstatements to their customers in violation of section 6700(a)(2)(B), when they assigned a value to landfill ownership interests that in actuality did not exist and were worth nothing. The Government contends that, because the interests were worth nothing, assigning *any* value to those interests would have been in excess of 200 percent of the correct valuation.

  **B. Conduct Subject to Penalty Under Sections 6694(a) and 6694(b)(2)(B)**

It is a violation of section 6694(a) of the IRC for a tax return preparer to prepare any return that contains an unreasonable position that the tax return preparer reasonably should have known was unreasonable. I.R.C. § 6694(a). The Government contends that Defendants violated this provision every time they prepared a tax return for their customers claiming false FNS Credits. Defendants maintain that they did not violate this provision because they did not have the requisite scienter. Alternatively, Defendants assert that their conduct falls within this section's "reasonable cause exception." It is a defense under section 6694(a) "if it is shown that there is reasonable cause for the understatement and the tax return preparer acted in good faith." I.R.C. § 6694(a)(3) ("reasonable cause exception").

It is a violation of section 6694(b)(2)(B) of the IRC for a tax return preparer to recklessly prepare a return containing an understatement of tax liability. I.R.C. § 6694(b)(2)(B). Courts interpret the "reckless or intentional disregard of rules" language under section 6694(b) as a negligence standard. *See, e.g.*, *United States v. Bailey*, 789 F. Supp. 788, 812-13, n.17 (N.D. Tex. 1992) ("The legislative history of Code section 6694 also supports this interpretation [of a negligence standard]."). Negligence is defined as including "any failure to make a reasonable attempt to comply

with the provisions of [the Internal Revenue Code]." I.R.C. § 6662(c); *Bailey*, 789 F. Supp. at 812-13.

### C. Standard for Injunctive Relief

As previously noted, the Government contends that both Defendants should be enjoined from engaging in the specific conduct that gave rise to this lawsuit. In addition, the Government contends that a broader injunction is appropriate as to Hand-Bostick. Specifically, the Government contends that Hand-Bostick should be enjoined "not merely from engaging in specified misconduct, but should be barred altogether from acting as a federal tax preparer." Pl.'s Am. Compl. ¶¶ 225, 231, 238, and 243.

Sections 7407 and 7408 of the IRC allow injunctive relief when appropriate to prevent the recurrence of prohibited conduct. I.R.C. § 7407(b)(2), 7408(b)(2). Thus, to be entitled to injunctive relief under sections 7407 and 7408, the Government has the burden of establishing: (1) Defendants engaged in conduct subject to penalty under sections 6700 or 6694; and (2) injunctive relief is appropriate to prevent the recurrence of such conduct. To obtain a broader injunction prohibiting a person, such as Hand-Bostick, from acting as an income tax return preparer, the Government must demonstrate, in addition to the above requirements: (1) that the person has "continually or repeatedly" engaged in the prohibited conduct; and that (2) "an injunction prohibiting such conduct would not be sufficient to prevent such person's interference with the proper administration of [the tax laws]." I.R.C. § 7407(b)(2). Courts customarily consider the totality of circumstances and the following factors in determining the appropriateness of injunctive relief under sections 7407 and 7408: (1) the gravity of harm caused by conduct; (2) the extent of the defendant's participation and her degree of scienter; (3) whether the infraction was isolated or recurrent in nature and the

likelihood that the defendant's business activities might again involve her in such transactions; the defendant's recognition of her own culpability; and the sincerity of the defendant's assurances against future violations. *See United States v. Buttorff*, 761 F.2d 1056, 1062-63 (5th Cir. 1985); *Bailey*, 789 F. Supp. at 816. Section 7402(a) "encompasses a broad range of powers necessary to compel compliance with the tax laws" and "has been used to enjoin interference with tax enforcement even when such interference does not violate any particular statute. *United States v. Campbell*, 704 F. Supp. 715, 730 (N.D. Tex. 1988), *aff'd as modified by* 897 F.2d 1317 (5th Cir. 1990) (citing *United States v. Ernst & Whinney*, 735 F.2d 1296, 1300 (11th Cir. 1984), *cert. denied*, 470 U.S. 1050 (1985)).

### D. Application of Law to Facts

The court concludes that Defendants engaged in conduct subject to penalty under I.R.C. §§ 6700(a)(2)(A), 6700(a)(2)(B), 6694(a), and 6694(b)(2)(B) because it was unreasonable and reckless for them, as tax return preparers, to recommend to their customers that they take FNS Credits when they admittedly did not understand the basis for their customers' entitlement to take such credits. Further, all of the FNS Credit transactions by Defendants were based on backdated documents purportedly effective the year before they were actually made. Defendants' knowing use of backdated documentation to claim the FNS Credits in preparing their customers' tax returns should have been a red flag and alerted them that something was amiss regarding the allowability of the credits taken. Accordingly, even though they had no duty of inquiry under section 6700, the court concludes that Defendants, as tax return preparers, reasonably should have known that it was unreasonable and reckless for them to recommend FNS Credits to their customers and prepare tax returns for their customers in which FNS Credits were claimed. The court also concludes that Defendants furnished

**Memorandum Opinion and Order - Page 17**

gross valuation overstatements to their customers when they assigned a value to nonexistent ownership interests that lacked any economic substance or value.

Although the court concludes that Defendants engaged in penalty conduct, it does not believe that an injunction is necessary or appropriate in this case. The court in no way condones Defendants' conduct, but its analysis does not end here because it must also determine whether an injunction is necessary in light of the facts of this case. Based on the court's extensive observations of Defendants during trial of this case and other factors, the court concludes that an injunction is not warranted under sections 7407, 7408, or 7402(a) of the IRC to prevent a recurrence of Defendants' prohibited conduct or interference with tax enforcement in the future. In all of the years that Defendants have prepared tax returns, this is their first infraction, and the court previously found that there was no evidence they had actual knowledge regarding the illegality of the FNS Credits claimed on behalf of their customers. To support its contention that an injunction is necessary to prevent the recurrence of prohibited conduct, the Government focuses on Defendants' preparation of tax returns claiming capital and theft loss deductions. The Government contends that Defendants should have and would have known that claiming such deductions was improper under the circumstances if they had researched applicable federal and Texas statutory and case authority or sought out legal advice from a tax attorney.

The court disagrees that either Hand-Bostick or Spinelli, as tax preparers, should be held to the standard of a seasoned attorney with full knowledge of statutory and case authority, and the Government has not presented any evidence or authority that persuades the court that tax preparers are held to the same standard as attorneys or are required in every instance to seek the advice of a tax attorney. Moreover, given the timing of the claimed losses and Defendants' testimony that they

**Memorandum Opinion and Order - Page 18**

thought that the deductions were appropriate at the time, the court concludes that Defendants' conduct in this regard is not sufficiently indicative that they will continue to participate in or promote fraudulent tax credits or tax shelter schemes.

The court's determination that an injunction is not warranted in this case also turns in large part on the credibility of Defendants' testimony and the court's observation of Defendants during the trial of this case. Overall, the court found Defendants' testimony and their assurances that they would not engage in similar conduct in the future to be sincere. The court believes that Defendants have learned their lesson and will be deterred by their knowledge of the severity of potential penalties they could face if they violate the internal revenue laws in the future. After having to endure the costly and lengthy legal proceedings in this case and the Government's exhaustive investigation for more than seven years; experiencing public shame, humiliation, and disfavor with clients; being the target of an IRS investigation, and knowing that some participants in the scheme received criminal convictions, Defendants would be more than foolish to engage in the same or similar conduct again in the future. The court will therefore deny the Government's request for an injunction against Defendants under sections 7407, 7408, or 7402(a) of the IRC with respect to specific misconduct. As the court does not believe that an injunction with respect to specific conduct is necessary, it follows that the broader injunctive relief requested as to Hand-Bostick is also unnecessary.

## IV. Conclusion

After considering the totality of the circumstances in this case, the court **concludes**, for the reasons herein explained, that, while Defendants engaged in conduct subject to penalty under I.R.C. §§ 6700(a)(2)(A), 6700(a)(2)(B), 6694(a), and 6694(b)(2)(B), an injunction under sections 7407,

7408, or 7402(a) of the IRC is not necessary to prevent Defendants from engaging in the same or similar prohibited conduct or interfering with tax administration or enforcement in the future. The court therefore **denies** the Government's request for injunctive relief under sections 7407, 7408, and 7402(a) of the IRC. Judgment will issue by separate document as required by Federal Rule of Civil Procedure 58.

    **It is so ordered** this 8th day of October, 2014.

                                    Sam A. Lindsay
                                    United States District Judge